**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CAROL LIOGGHIO,

           Plaintiff,                    CASE NO. 15-12803

v.                                   HON. DENISE PAGE HOOD

SALEM TOWNSHIP and
GARY WHITTAKER,

           Defendants.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [#61]**

## I.     INTRODUCTION

This matter is presently before the Court on a Motion for Summary Judgment filed by Defendants Gary Whittaker and Salem Township. (Doc #61). The Motion has been fully briefed. The Court previously notified the parties that the Motion would be decided on the briefs, without oral argument. (Doc #71). For the reasons that follow, the Motion is granted in part and denied in part.

## II.     BACKGROUND

Plaintiff Carol Liogghio was hired in 1998 as a receptionist for Defendant Salem Township (the "Township"). She became an Administrative Assistant reporting to the Township Supervisor in 2001. Plaintiff was the Township's only

full-time clerical employee prior to November 2012. In 2012, Plaintiff ran for Township Clerk on a Republican slate with then-Township Supervisor Robert Heyl ("Heyl"). Defendant Gary Whittaker ("Whittaker") ran for Township Supervisor on a different Republican slate. Whittaker's slate won the August primary election and the general election. Whittaker became the Township Supervisor, effective in November 2012.

After the primary election and before Whittaker took office, then-Township Supervisor Heyl went "to the home of newly elected supervisor Gary Whittaker, to congratulate him on his election victory and to offer him any transition help he may need; at that meeting, Supervisor elect Gary Whittaker, requested that I let Carol Liogghio go before he took office." (Doc #14, PgID 70 (First Heyl Affidavit, dated May 13, 2015)) At his deposition, however, Heyl testified that Whittaker did not ask Heyl to fire Plaintiff.

In the fall of 2012, Whittaker had a conversation with O'Neill Muirhead ("Muirhead"), a resident of the Township. Muirhead states that he suggested to Whittaker that Whittaker continue to employ the then-Township Attorney and Plaintiff when Whittaker assumed the position of Township Supervisor. Muirhead avers that Whittaker responded that Whittaker "was not going to fire her; however, he would force her to quit." (Doc #14, PgID 72 (Muirhead Affidavit, dated May 22, 2015)) At his deposition, Muirhead testified that he could not recall the words

used by Whittaker but interpreted them to mean that Whittaker would force Plaintiff to quit. (Doc. #61, Ex. 14 at 33)

Between the primary election and when Whittaker took office, Whittaker and then-Township Clerk and Trustee David Trent had a meeting with Plaintiff. Plaintiff states that Whittaker told her at that meeting that "he cannot work with me anymore, that it would not be a good, good for me with him, and that I should find myself new job, a new job, get a new job." (Doc #61, Ex. 2 at 88-89) Plaintiff testified that Whittaker also stated, "No, I won't fire you, but you're not going to want to be here. You're not going to be happy in the office." *Id.* at 90. Whittaker made it clear that he would make it uncomfortable for her. *Id*. at 95.

Prior to Whittaker becoming Township Supervisor, Plaintiff performed many duties, including the following:

    A. Working with the contracted building department coordinator;

    B. Issuing building permits for the Township when the coordinator was not there;

    C. Assisting the Township Treasurer, especially during tax season;

    D. Organizing the Summer Farmers Market;

    E. Assisting the Fire Department with clerical matters and issuing fire permits;

    F. Handling FOIA activities for the Township;

    G. Assisting the Township Supervisor in hiring temporary help for the Township;

H. Organizing several annual community programs;

I. Attending meetings with various government officials with Township Supervisor Roperti (Reyl's immediate predecessor);

J. Assisting the Township Supervisors in various administrative and clerical functions;

K. Serving as a Notary Public and assisting residents in notarizing documents;

L. Assisting the Township Clerk as needed and requested;

M. Preparing the monthly Board of Trustees agenda and assembling packets for distribution;

N. "Developing" the landfill pass system; and

O. Serving as editor the Township newsletter.

When Whittaker took office, the maximum staff hours were reduced for all Township employees. Plaintiff was the only full-time clerical employee of the Township at that time. Ann Alexander ("Alexander") was hired in June 2013 as a temporary employee to cover Plaintiff's duties while Plaintiff was off work for back surgery. Alexander was hired permanently in December of 2015 with the title of "Administrative Assistant II." Lori O'Brien ("O'Brien") was hired in December 2013 and held the title of building department coordinator. Plaintiff contends that Alexander, O'Brien, and an additional township employee (Barbara Thompson) were assigned duties that belonged to Plaintiff in an effort to remove duties from her or replace her.

On January 2, 2015, several interactions transpired regarding the issuance of a landfill pass. Plaintiff denied a new resident, Cindy Marriott, a landfill pass because Ms. Marriott did not have a Township address on her driver license. Plaintiff continued to deny Ms. Marriott a landfill pass even after Barbara Thompson, a Township employee who was present, vouched for Ms. Marriott's residency in the Township. Thompson communicated to Plaintiff that Ms. Marriott had filed for an affidavit of principal residency exemption the previous month and that Thompson knew Ms. Marriott was a Township resident. But, Plaintiff insisted that a landfill pass could only be issued to a person with a driver license with a Township address.

As a result of that incident, Thompson called her husband, and her husband contacted Whittaker. Whittaker went to Ms. Marriott's home and obtained paperwork from her, then headed to Township Hall and told Plaintiff to issue Ms. Marriott the landfill pass because he knew Ms. Marriott was a resident. Whittaker also told Plaintiff that landfill passes were to be issued to anyone with a tax bill with that person's name on it. Plaintiff continued to insist that Township policy required that a person requesting a landfill pass have a driver license with a Township address, but Plaintiff has not submitted to the Court any documentation that such a requirement exists.

Plaintiff states that Whittaker got upset when she advised him that she would have to notify the Landfill Manager and Township officials, including the Board, about the alleged wrongful issuance of permits to persons who did not have a driver license with a Township address. Plaintiff states that Whittaker raised his voice and began to scream and holler at her, which caused her extreme emotional distress and required her to leave work. There is no evidence that Whittaker yelled at her or treated her poorly in person at any other times.

Plaintiff went to a doctor on January 5, 2015, and the doctor placed Plaintiff off work through August 6, 2017. Whittaker wrote Plaintiff on July 7, 2015 that the Township was holding her position open. Plaintiff responded to the July 7, 2015 email, stating that her doctors would not allow her to return, and Plaintiff never returned to the position she held in January 2015. Plaintiff, now approximately 75 years old, had a heart attack and a stroke in 2016, and she is no longer able to work.

Plaintiff filed this action on August 10, 2015. On August 9, 2016, the Court granted a motion to dismiss, pursuant to which: (a) all defendants were dismissed except for Whittaker and the Township; and (b) all claims were dismissed except Plaintiff's First Amendment retaliation claim in Count I. Whittaker and the Township now seek summary judgment with respect to Plaintiff's First Amendment retaliation claim.

## III. LEGAL STANDARDS

### A. Rule 56

Rule 56(a) of the Federal Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriately rendered "if the pleadings, depositions, answers to interrogations and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Redding v. St. Eward,* 241 F.3d 530, 532 (6th cir. 2001). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor.

The court must view admissible evidence in the light most favorable to the nonmoving party; where "the moving party has carried its burden under rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,*

475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986). The nonmoving party's version of the facts must be relied upon unless blatantly contradicted by record evidence. Scott v. Harris, 550 U.S. 372, 378, 380-81 (2007). Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing there is a genuine issue for trial." *Celotex Corp.,* 477 U.S. at 322-23. Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id*. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

### B. First Amendment

In order to establish a First Amendment retaliation claim, the plaintiff must establish that "(1) She engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against her that would deter a person of ordinary firmness from continuing to engage in that conduct, and (3) the adverse action was motivated at least in part as a response to the exercise of the Plaintiff's

constitutional rights." *Scarbrough v. Morgan Cnty. Board of Educ.*, 470 F.3d 250, 255 (6th Cir 2006). The definition of both protected activity and causation depends on the circumstances, *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir. 1999), and "whether activity is 'protected' or an action is 'adverse' will depend on context." *Id.* at 388.

### 1. Adverse Action

In most instances, the determination of whether actions are sufficiently adverse is a question of fact to be decided by the factfinder. *Bell v. Johnson*, 308 F.3d 594, 603 (6 th Cir. 2002) (citing *Thaddeus-X*, 175 F.3d at 398-99). The court must analyze whether the official's acts would chill a person of ordinary firmness from engaging in the protected activity. *Thaddeus-X*, 175 F.3d at 396. Adverse actions in the public employment context are traditionally employment related actions such as discharge, a material loss of benefits, a demotion, or refusal to hire or refusal to promote.

> An adverse employment action is "a materially adverse change in the terms of ... employment." *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). "Termination, decrease in wage or salary, change in title, diminished material responsibilities, or a material loss of benefits are all examples of a materially adverse change." *Mensah v. Michigan Dept. of Corrections*, 621 Fed.Appx. 332, 334 (6th Cir. 2015).

*Lee v. Cleveland Clinic Foundation*, 676 F. App'x 488, 494 (6th Cir. 2017); *Dye v. Office of the Racing Comm'n* 702 F.3d 286 (6th Cir. 2012). Constructive

discharge constitutes a material adverse employment action. *Lee*, 676 F. App'x at 495-96.


### 2. *Establishment of Causation*

An employee must point to "specific non-conclusory allegations" linking his or her protected actions to the employer's discipline. *Bailey v. Floyd Board of Educ.,* 106 F.3d 135 (6th Cir. 1997). Personal beliefs, conjecture, and/or speculation are not considered to be direct evidence. *Grizzell v. City of Columbus Police*, 461 F3d 711, 724 (6th Cir. 2006). Courts have held that an employee may not rely upon the mere fact that adverse employment action was taken following the speech. *Ratiff v. Wellington Exempted Village School Board,* 820 F2d 792, 795 (6th Cir. 1987).

To establish a causal connection, Plaintiff must produce evidence of a retaliatory motive such that a reasonable juror could conclude that the adverse action would not have occurred "but for" her engagement in the protected activity. *Eckerman v. Tennessee Dep't of Safety,* 636 F.3d 202, 209 (6th Cir. 2010).

> Our discussion of the "adverse action" requirement in *Thaddeus–X* makes it clear that, in most cases, the question of whether an alleged retaliatory action poses a sufficient deterrent threat to be actionable will not be amenable to resolution as a matter of law:
>
>> We emphasize that while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended

> to weed out only *inconsequential actions*, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment.
>
> *Thaddeus–X*, 175 F.3d at 398 (emphasis added); *see also Bart*, 677 F.2d at 625. Thus, unless the claimed retaliatory action is truly "inconsequential," the plaintiff's claim should go to the jury. *Thaddeus–X*, 175 F.3d at 398.

*Bell*, 308 F.3d at 603.

If the employee establishes a prima facie case, the burden shifts to the employer to demonstrate by a preponderance of the evidence that they would have taken the same action absent the protected conduct. *Dye*, 702 F.3d at 294 (citing *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010)). "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Eckerman*, 636 F.3d at 208. "Unlike in the *McDonnell Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims." *Dye*, 702 F.3d at 295.

### C. Qualified Immunity

To overcome a defendant's claim to qualified immunity, a plaintiff must be able to demonstrate: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged

conduct." *Ashcroft v. Al-Kidd,* 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 US 800, 818 (1982)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Qualified immunity bars suits where reasonably competent officials could disagree on the legality of an action, protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). A government official "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that the action at issue was lawful; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id*.

## IV.  ANALYSIS

### A. Whittaker Not Entitled to Summary Judgment

The Sixth Circuit has ruled that "if genuine issues of material fact exist as to whether the officers committed acts that would violate a clearly established right, then summary judgment is improper." *Bietz v Gribble*, 641 F3d 743, 749 (6th Cir. 2011). Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that there is a genuine dispute of material fact as to whether Whittaker

violated Plaintiff's clearly established right to be free from retaliation for campaigning against the successful candidate/slate.

It is undisputed that Plaintiff engaged in constitutionally protected conduct when she ran for Township Clerk in 2012, on a slate that ran against the slate headed by Whittaker. The burden of proof is on Plaintiff to show that a reasonable jury could find that Whittaker and/or the Township took adverse action(s) against her that would deter a person of ordinary firmness from continuing to engage in that conduct. Plaintiff also must show that the adverse action taken was motivated at least in part as a response to Plaintiff's exercise of her constitutional rights.

Viewing the evidence in a light most favorable to Plaintiff, the Court finds that there is a question of fact whether Whittaker took adverse action against Plaintiff that would deter a person of ordinary fitness from continuing to run for office. First, there is a genuine dispute as to whether Plaintiff was discharged. Although Plaintiff was not terminated by the Township, there is evidence that Plaintiff was constructively discharged, an action that is sufficient for purposes of establishing adverse action. *Lee*, 676 F. App'x at 495-96. The constructive discharge doctrine contemplates a situation in which the employee's "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, 136 S.Ct. 1769,

1776 (2016). When an employee resigns under such circumstances, the "resignation [i]s tantamount to an actual discharge." *Id.* at 1776-77.

To demonstrate constructive discharge, Plaintiff must produce evidence to show that (1) "the employer…deliberately create[d] intolerable working conditions, as perceived by a reasonable person," (2) the employer did so "with the intention of forcing the employee to quit," and (3) "the employee…actually quit." *Savage v. Gee* F. 3d 732 (2012). Criticism and challenge alone do not establish constructive discharge, *Peters v. Lincoln Electric Co.,* 285 F.3d 456, 478 (6th Cir. 2012), and both the employer's intent and the employee's objective feelings must be examined.

It is undisputed that Plaintiff ceased working as of January 2, 2015, in essence resigning and satisfying the third constructive discharge prong. The second prong is satisfied, as there is evidence that Whittaker intended to force Plaintiff to quit. Specifically, there is evidence that: (a) after winning the primary election but before taking office, Whittaker asked Heyl to fire Plaintiff before Heyl's term ended; (b) in the fall of 2012, Whittaker told Muirhead that Whittaker was not going to fire Plaintiff but instead was going to force Plaintiff to quit; and (c) Whittaker told Plaintiff that he could not work with her, she would be unhappy in the office, and that she should find a new job. All of those comments constitute

sufficient evidence that Whittaker had the intent of forcing Plaintiff to quit, thereby surviving summary judgment.

The first prong is supported by evidence that Plaintiff's important duties and responsibilities were reduced significantly after Whittaker took office and during the period leading up to January 5, 2015, when Plaintiff's doctor directed her not to return to work just days after Whittaker yelled at her. There is evidence that some duties were taken away from Plaintiff and others were hired to perform those duties, including Ann Alexander and Lori O'Brien. Plaintiff has testified that her hours were cut, her job duties were reduced, and her work environment was intolerable under Whittaker.[1] Finally, there is evidence that Whittaker yelled at Plaintiff on January 2, 2015 and stripped her of her responsibilities for issuing landfill permits that day. Those actions are offered as evidence that Whittaker was trying to alter Plaintiff's conditions of employment and force her to quit her job. The Court also notes that the evidence shows that Plaintiff was never cited or disciplined during her employment by the Township, a period in excess of 16 years, and there is no evidence that Plaintiff lacked the qualifications to – or was incapable of – performing those duties, all of which suggest that there was no need to strip Plaintiff of her duties and responsibilities.

---

[1] This evidence also may qualify as adverse actions taken against Plaintiff, for purposes of establishing the second element of a First Amendment retaliation claim.

Plaintiff has produced evidence of a retaliatory motive such that a reasonable juror could conclude that the adverse action would not have occurred "but for" her engagement in the protected activity. There is evidence that Whittaker, on three occasions after his slate prevailed over the slate Plaintiff ran on but prior to taking office, verbally expressed that he did not want Plaintiff to continue working for the Township. Defendants correctly argue that there is evidence that Whittaker made those statements for reasons unrelated to Plaintiff's political activity (specifically, (1) the criticism of Whittaker's farm by Plaintiff or her husband, and/or (2) the manner in which Plaintiff treated other employees and Township residents). Although the evidence certainly could persuade a jury to conclude that Plaintiff's political campaign had nothing to do with the termination of her employment relationship with the Township, the Court must view the evidence in a light most favorable to Plaintiff.

Heyl's affidavit states that a meeting took place in which Whittaker requested that Heyl fire Plaintiff so Whittaker would not have to do so himself. (Doc #14-1, pg. 70). Muirhead's affidavit restated a conversation in which Whittaker allegedly told Muirhead that he would make Plaintiff quit instead of firing her.[2] Plaintiff states that she was ordered into the Township auditorium in

_____

[2] Defendants contend that the evidence presented in the Muirhead and Robert Heyl's affidavits is inadmissible, but the Court does not agree. The fact that inconsistent affidavits were presented (Heyl), or that a witness's deposition

November of 2012, at which time Whittaker told her he wanted her to quit as he could not work with her. That Whittaker allegedly made three statements about getting rid of Plaintiff during the 60 to 90-day time frame immediately following the primary election at which his slate prevailed, together with Plaintiff's duties being significantly reduced during the months that followed, constitutes sufficient evidence to create a genuine dispute of material fact whether the adverse actions promulgated by Whittaker were motivated, at least in part, as a response to Plaintiff exercising her constitutional rights.

The fact that, in the twelve months following the incident in the Township Auditorium in November 2012, Plaintiff "had almost all of her duties and responsibilities removed from her by the Township Board and Whittaker when he hired new employees and transferred Plaintiff's work to the new employees leaving Plaintiff with no substantive work to do" also supports a finding of causation. Accordingly, the Court concludes that Plaintiff has satisfied her burden with respect to the three requisite elements to establish a First Amendment retaliation claim.

Whittaker also is not entitled to qualified immunity. Plaintiff had a constitutional right to be free from retaliation for exercising her First Amendment

---

testimony allegedly is inconsistent with averments in his affidavit (Muirhead), does not make the affidavits inadmissible; it just means a factfinder will need to make a credibility determination.

right to run for political office against the prevailing candidate/slate. The Supreme Court and the Sixth Circuit have held – and it has been well-established for decades -- that patronage dismissal, or the practice of discharging employees because they in some fashion support a political agenda other than the one supported by their employer, violates the First and Fourteenth Amendments. *See, e.g., Elrod v. Burns,* 427 U.S. 347, 373 (1976); *Caudill v. Hollan*, 431 F.3d 900, 908 (6th Cir. 2005); *McCloud v. Testa*, 97 F.3d 1536, 1556 (6th Cir. 1996). Based on *Elrod* and its progeny, every reasonable official would have understood that Whittaker's actions toward Plaintiff violated Plaintiff's clearly established constitutional right not to be retaliated against for running for public office. As *Elrod* was decided in 1976 and there have been many consistent Sixth Circuit decisions issued since then, the right was well-established at the time of the underlying events. For those reasons, Whittaker is not entitled to qualified immunity.

Accordingly, the Court denies Defendant's Motion for Summary Judgment as to Whittaker.

### B. No Municipal Liability for the Township

A municipal defendant can be subject to direct liability only if it causes a constitutional violation and harm to the plaintiff because it "implements or executes a policy statement, ordinance, regulation or decision officially adopted

and promulgated by" that body's officers. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Section 1983." *Id.* at 694. A plaintiff cannot allege a viable claim based solely on vicarious liability or *respondeat superior*. *Id.* at 691. The municipality's policy (or absence of one) must be a "moving force" in the deprivation of the plaintiff's constitutional rights and such policy must have arisen from "deliberate indifference" to the rights of its citizens. *Doe v. Claiborne Cty., Tenn.*, 103 F.3d 495, 508 (6th Cir. 1996).

Plaintiff alleges that "the Board was an active participant in assisting Whittaker in carrying out his nefarious intent to force Plaintiff to retire." (Doc #68, P 22). The "Hiring Decisions" section of the Township Policy & Procedure manual states that "the executive officers of the Board (Township Supervisor, Township Clerk and Township Treasurer) are authorized to interview and hire temporary positions within the budget allocations for their departments and to appoint and hire own deputies." (Doc #68, Exhibit 11) In his role as Township Supervisor, Whittaker was authorized to interview and hire all temporary positions and deputies in Plaintiff's department. Whittaker was the primary actor behind each decision that Plaintiff claims to be an adverse action, including the "motion to

approve the change in the job description of the current Administrator Assistant" (Doc #68-2) and "motion to authorize temporary employee position" (Doc #68-2).

The Court finds that Township Charter conveys primary responsibility for hiring decisions within Plaintiff's division to Whittaker, not the Board as a whole. There is no evidence that the members of the Board or the Board itself, being removed from Plaintiff's workspace, were aware of any of the alleged hostility or motivation for retaliation held by Whittaker against Plaintiff. Plaintiff also fails to provide evidence that the Township Board (or the Township) engaged in any activity that would constitute a custom, policy, or practice of unconstitutional conduct.

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to the Township.

## V. CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Defendants Township of Salem and Gary Whittaker's Motion for Summary Judgment (Doc #61) is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that the First Amendment retaliation claim against the Township of Salem is DISMISSED and the Township of Salem is DISMISSED from this cause of action.

IT IS FURTHER ORDERED that the First Amendment retaliation claim remains against Gary Whittaker, who is not entitled to summary judgment or qualified immunity.

s/Denise Page Hood
Chief Judge, U. S. District Court

DATED: July 2, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 3, 2018, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager